IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| RUSSELL C. HIBBELER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. _____ |
| | ) |
| PEARSON EDUCATION, INC., | ) |
| | ) |
|     Defendant. | ) |

## COMPLAINT

## PARTIES AND JURISDICTION

1. Plaintiff Russell C. Hibbeler is a citizen and resident of the state of Louisiana and of no other state. He is a renowned professor of engineering, currently serving on the faculty of the University of Louisiana – Lafayette, and is a respected and successful author of engineering textbooks in several engineering disciplines which have been used in college and post-graduate curricula throughout teaching institutions across the country and around the world.

2. Upon information and belief, Pearson Education, Inc. ("Pearson") is a corporation organized and existing under the laws of the state of Delaware. Plaintiff avers that its principal place of business for purposes of citizenship is in Upper Saddle River, New Jersey, while Pearson alleges that its "Principal Executive Office" is in New York, New York. It is a citizen of Delaware and New Jersey and of no other state.

3. This Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1331, as the claims arise pursuant to the Copyright Law, 17 U.S.C. § 101, et seq., and the Lanham Act, 15 U.S.C. § 1125, et seq. In addition, this Court has subject matter jurisdiction over these

claims pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and the Defendant and the matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

4. This Court has personal jurisdiction over the Defendant because it is authorized to do business in Tennessee and has significant contacts with Tennessee. Venue is proper in this Court because the causes of action have arisen within the Middle District of Tennessee pursuant to 28 U.S.C. § 1391; because the Defendant resides in this judicial district; because it is subject to the Court's personal jurisdiction; and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district; and a substantial part of the property that is the subject of the action is situated in this district. While, in some instances, contracts between the parties recite that venue is proper in the United States District Court for the Southern District of New York, Plaintiff has not agreed, nor did the parties agree, that that designated venue is exclusive.

5. The works in dispute authored by the Plaintiff (the "Hibbeler Works") are sold in at least seven (7) colleges/universities and other outlets in this judicial district, to wit: (1) Tennessee Technological University, (2) Middle Tennessee State University, (3) Trevecca Nazarene University, (4) Vanderbilt, (5) Tennessee State University, (6) Nashville Textbook Brokers, and (7) University of Memphis. Among the Hibbeler Works available in these outlets and universities in this judicial district are numerous titles in multiple editions and revisions.

## THE FACTS

6. Plaintiff has entered into a series of contracts and amendments thereto with the Defendant or Defendant Pearson's predecessors in interest (the "Publishing Agreements"). Pursuant to the Publishing Agreements, Plaintiff has conveyed to the Defendant certain of the

rights embodied in the copyrights to the works which he has created. In exchange for the right to publish and distribute textbooks embodying content which Plaintiff has authored, the Defendant has agreed to compensate him for the sales of each such work on the terms and conditions as set forth in the Publishing Agreements. Plaintiff alleges that Defendant has failed to do so and seeks to recover monies due and owing him because of the Defendant's underpayment and non-payment of royalties in breach of the applicable Publishing Agreement.

7. In addition, the Defendant has created, published and distributed derivative works without the Plaintiff's permission and/or failed to pay royalties with respect to such works, in breach of the applicable Publishing Agreement, if any, and thereby infringed upon Plaintiff's copyrights. Further, Defendant has breached the applicable Publishing Agreement and infringed Plaintiff's copyrights by publishing and distributing works in digital or electronic form without his permission; and, in violation of his copyrights, has continued to distribute certain works without compensating Plaintiff therefor.

8. In addition, and in violation of the Lanham Act, 11 U.S.C. § 1125(a), the Defendant has falsely designated Plaintiff as an author of certain works embodying material which he has neither created, authorized, nor approved, which false designation misleadingly conveys that he is the author of material when he is not and is likely to cause confusion, mistake or to deceive others as to the source of the content of the work and Plaintiff's association therewith. In addition, and without Plaintiff's permission, Defendant has used his name, together with other alleged "co-authors" of works, suggesting that he has collaborated with; is associated with; or has approved content allegedly authored by them when he has not done so, thereby conveying misleading descriptions of fact or false or misleading misrepresentations of fact which are likely to cause

confusion, mistake or deception as to his association with such other persons or as to his sponsorship or approval of these works, all to Plaintiff's damage.

## PUBLICATION OF THE TEXTBOOKS

9. Plaintiff has created and authorized Defendant to publish and distribute at least thirteen (13) separate textbooks, each pursuant to a particular Publishing Agreement. In addition, in most, if not all, instances, the Defendant, pursuant to a series of amendments, induced Plaintiff to make changes, deletions and/or additions to each of the textbooks and published and distributed those modified works as a separate subsequent "Edition." Paragraphs 9-21 infra. identify and describe each such separately titled textbook.

10. On June 14, 1971, Plaintiff entered an agreement with the Macmillan Company pursuant to which he authorized it to publish and distribute a textbook of approximately 850 pages, with some 1500 illustrations, entitled "Engineering Mechanics: Statics and Dynamics." The Defendant published fourteen (14) separate and subsequent editions of "Engineering Mechanics: Statics and Dynamics", each pursuant to an amendment to the original June 14, 1971 Agreement.

11. On August 7, 1975, Plaintiff entered into an agreement with "Macmillan Publishing Co., Inc." pursuant to which he authorized it to publish and distribute a textbook entitled "S.I. Engineering Mechanics: Dynamics, Second Edition." The work was to consist of 576 pages, approximately, together with some 705 illustrations.

12. Also on August 7, 1975, Plaintiff entered into an agreement with "Macmillan Publishing Co., Inc." pursuant to which he authorized it to publish and distribute a work consisting of approximately 464 pages, including 739 illustrations for a textbook entitled "S.I. Engineering Mechanics: Statics, Second Edition."

13. On July 8, 1983, Plaintiff entered into an agreement with "Macmillan Publishing Co., Inc." authorizing it to publish and distribute a textbook of approximately 237,600 words and some 1105 line drawings entitled "Engineering Mechanics: Dynamics Scalar Version."

14. Also on July 8, 1983, Plaintiff entered into an agreement by which he authorized "Macmillan Publishing Co., Inc." to publish and distribute a textbook of approximately 446,400 words and some 2399 line drawings entitled "Engineering Mechanics: Statics And Dynamics Scalar Version."

15. On July 8, 1983, Plaintiff entered into an agreement pursuant to which he authorized the "Macmillan Publishing Co., Inc." to publish and distribute a textbook in the approximately length of 208,800 words and some 1294 line drawings entitled "Engineering Mechanics: Statics Scalar Version."

16. On January 4, 1984, Plaintiff entered into an agreement with "Macmillan Publishing Co., Inc." pursuant to which Plaintiff authorized it to publish and distribute a textbook entitled "Structural Analysis" to consist of approximately 268,200 words and some 700 line drawings. Pursuant to separate and subsequent amendments to that Agreement, the Defendant published nine (9) subsequent editions of "Structural Analysis", for a total of ten (10) editions.

17. On January 3, 1986, Plaintiff entered into a contract with "Macmillan Publishing Company" pursuant to which Plaintiff authorized it to publish a textbook entitled "Study Guide And Problems Book To Accompany Engineering Mechanics: Statics And Dynamics, Fourth Edition." This work was to consist of approximately 135,000 words.

18. On May 19, 1989, Plaintiff entered into an agreement with "Macmillan Publishing Company, a division of Macmillan Inc.," pursuant to which Plaintiff authorized Macmillan to publish and distribute a textbook entitled "Mechanics Of Materials" to consist of approximately

288,000 words. The Defendant published a total of ten (10) separate subsequent editions of "Mechanics Of Materials", each pursuant to a separate and subsequent amendment to the May 19, 1989 contract.

19. On November 19, 1990, Plaintiff entered into a contract with "Macmillan Publishing Company, a division of Macmillan, Inc., a division of Maxwell Communications, Inc." pursuant to which he authorized it to publish "Macmillan International Student Editions" of "Engineering Mechanics: Statics, Fifth Edition" and "Engineering Mechanics: Dynamics, Fifth Edition" to be sold in foreign countries where that edition was not then sold "because the cost is prohibitive". The parties agreed that the applicable royalty rate for such sales was 12%.

20. By a "Letter of Agreement" dated February 11, 1994, the parties agreed that the paperback "International Student Edition" of these works would bear a 12% royalty, and as evidenced by a letter of July 31, 1997, that the 12% royalty rate would apply to all future editions of the "International Student Edition" of "Engineering Mechanics: Statics and Dynamics." Defendant, however, has failed to pay Plaintiff such a rate on all sales of these works.

21. In addition, the parties also agreed therein that for the Seventh Edition of the works and for "all subsequent editions" of "Engineering Mechanics: Statics and Dynamics", copies sold in the United States and Canada would bear royalties at 18%.

22. On December 12, 1990, Plaintiff entered into an agreement authorizing "Macmillan Publishing Co., a division of Macmillan Inc.," to publish and distribute a textbook entitled "Statics And Strength Of Materials" of approximately 405,000 words. Pursuant to a series of separate and subsequent amendments, Defendant has published four (4) additional editions for a total of five (5) editions of the work. Beginning with the 4th Edition of the work, the title was changed to

"Statics And Mechanics Of Materials" and a 5th Edition of the newly-titled work was subsequently published pursuant to an Amendment dated June 26, 2015.

23. Pursuant to an amendment dated November 14, 2000 between Plaintiff and "Prentice-Hall, Inc." to an Agreement dated July 31, 1985 (which was between Plaintiff and Macmillan Publishing Company with respect to "Engineering Dynamics: Statics and Dynamics, Fourth Edition"), the Defendant agreed to pay Plaintiff for the preparation of solutions manuals for the textbook entitled "Engineering Mechanics: Statics" and "Engineering Mechanics: Dynamics."

24. On December 20, 2010, Plaintiff entered into a contract with Pearson Education, Inc., d/b/a "Pearson Prentice-Hall" pursuant to which Plaintiff authorized Defendant to publish and distribute a textbook entitled "Fluid Mechanics." Defendant has published and distributed three (3) subsequent editions of "Fluid Mechanics", for a total of four (4) editions, each pursuant to an amendment to the original contract of December 20, 2010.

25. Pearson Education, Inc. is the successor in interest to all of the entities with which Plaintiff contracted pursuant to the Publishing Agreements and Amendments thereto and is the successor in interest to all of the rights and obligations of those contracting parties.

## THE AUDIT

26. In 2015, Plaintiff employed the accounting and royalty audit organization known as The Royalty Compliance Organization ("RCO") to undertake a review and audit of the books and records of Defendant for the period January 1, 2009 through December 31, 2014 in order to attempt to determine whether the payments by the Defendant of royalties and other sums due and owing pursuant to the Publishing Agreements had been fully and accurately paid. After having conducted extensive review and analysis of those books and records which were provided by

Defendant, RCO issued the "Russell C. Hibbeler/Pearson Education Audit Report" dated April 27, 2016 (the "Audit Report").

27. The Audit Report determined that there were significant underpayments and non-payments of royalties and other compensation due to Plaintiff pursuant to the Publishing Agreements and otherwise. The Audit Report categorized and described the bases for its conclusions that there were significant underpayments and non-payments of royalties and other compensation due Plaintiff. The Audit Report concluded that the entire amounts due Hibbeler may exceed even these amounts.

28. The Audit Report set forth detailed findings documenting its analysis and its conclusions.

## THE AUDIT CLAIMS

29. <u>Unreported ISBNs</u>. RCO began its undertaking by requesting documents and information from Pearson, including a list of all Hibbeler-authored products. In responding to RCO's requests, Pearson discovered that there were at least 16 ISBNs ("ISBN" is the acronym for "International Standard Book Number", a unique numeric commercial book identifier which is assigned to each edition and variation of a book), that had never been reported on Hibbeler's royalty statements. Pearson then accounted for the 16 ISBNs on Plaintiff's June 30, 2015 royalty statement and paid royalties with respect to those 16 ISBNs in the amount of $351,958. Pearson failed to pay interest on those amounts. RCO has calculated interest due and owing of $61,409. The total amount due with respect to the 16 previously unreported ISBNs for the period January 1, 2009 through December 31, 2014 is $413,367. RCO has reduced the interest sought to $59,192, resulting in a total claim of $411,150.

30.     <u>Underpaid Kits and Custom</u>.  In attempting to answer questions posed by RCO, Pearson admitted that it had underpaid royalties for 21 other ISBNs, including underpayments on multiple "Kit and Custom" products.  In addition, however, Pearson has failed to pay royalties due for Kits in the amount of $88,649, with interest thereon of $8,310.  On February 23, 2017, RCO had identified unpaid and underpaid royalties with respect to Kit and Custom products for the period January 1, 2009 through December 31, 2014 in the amount of $170,039.

31.     <u>Study Packs</u>.  RCO has determined that Pearson does not report or pay royalties to Plaintiff on the sales of "Study Packs" associated with Hibbeler's books.  Defendant has included, however, the Plaintiff's originally created works in "Statics and Dynamics Study Packs" which represents that it is authored by a third party named Peter Schiavone.  Study Packs are sold by Defendant as stand-alone items and as portions of Kits/Custom packages.  Several of the Publishing Agreements in force at the time of publication of certain "Study Packs" do not authorize Defendant to publish or exploit such products, at all.  In other instances, Defendant was obligated to request Plaintiff's consent before exploiting such products, and failed to do so.  Pearson has failed to provide complete sales data for study packs to RCO.  RCO has also identified the use and infringement of Hibbeler's works in a Study Pack, again representing that it is authored by Peter Schiavone for a Bedford/Fowler textbook.  In order to determine completely the amounts due because of these actions, non-payments and underpayments, RCO would need complete information with respect to sales of Study Packs but has determined that Plaintiff is entitled to at least $165,699 with respect to amounts unpaid for sales of Study Packs, as Pearson has not paid royalties as agreed on these materials which are originally created, at least in part, by Plaintiff.

32.     <u>Additional Unreported Study Packs</u>.  The RCO Audit has also determined that Pearson has failed to provide complete sales data for all Study Packs.  Study Packs have been sold

9 of 20
Case 3:17-cv-00945   Document 1   Filed 06/15/17   Page 9 of 20 PageID #: 9

as part of the Kit/Custom product that included a paid royalty bearing component RCO used for sales of the Kit/Custom package to value Hibbeler's share of the Study Pack. Pearson's revenue for those reported Study Packs RCO has determined to be $827,960. In addition, RCO has determined that at least 35 Study Packs were released in or prior to the audit period but have never been shown on royalty reports provided to Hibbeler and were not included in sales files or bills of material data provided by Pearson during the RCO Audit. RCO has determined that royalties are due on additional unreported Study Packs in the amount of $1,041,577 with interest thereon in the amount of $41,663 for a total estimated amount due for unreported Study Packs in the amount of $1,083,240.

33. <u>Mastering Products</u>. Pearson has embodied material authored by Plaintiff, including material provided to Pearson by Plaintiff pursuant to the Publishing Agreements, in a collection of online homework, tutorial and assessment products, including interactive learning aids, animations, dynamic study modules, tutorials, test banks, instructor materials, PowerPoints and videos, and to which products Pearson refers as "Mastering." Further, according to Pearson, Mastering is "the most effective and widely used online homework, tutorial and assessment system for the sciences designed to improve results and increase student engagement before, during and after class. Over 3,000,000 students are currently using Mastering and the Science and Engineering disciplines." In fact, RCO has determined that the entire contents of Hibbeler's textbooks are contained in the Mastering products and that each of the textbooks has been transformed into an electronic digital format.

34. RCO has determined that Pearson has failed to pay, or underpaid, $366,659 in royalties and other compensation from the Mastering products which, with interest thereon in the amount of $47,393, equals $414,052.

35.     In response, Pearson claims that it is "not required to pay royalties on content or tools that Dr. Hibbeler did not create that are included in the Mastering product."  It contends, instead, that "much" of the material embodied and attributed to Plaintiff was "developed by or on behalf of Pearson at considerable expense."  While it claims to have intended to pay Plaintiff "on 100% of the net sales receipts", Pearson now claims to have "overpaid" royalties to Plaintiff in an amount in excess of $1,500,000, alleging that it should have allocated the amounts payable to Plaintiff based only on the portion of each work that he actually authored, excluding that proportion thereof which Pearson contends Plaintiff did not actually prepare, and that he was only entitled to a greatly reduced royalty.

36.     Pearson chose to publish the Mastering products in this style and manner and to incur those costs attributable to such choice.  The Publishing Agreements provide that "the Publisher will publish the Work at its own expense in a style and manner it deems appropriate."  Pearson must pay Plaintiff, therefore, 100% of royalties, not some portion allegedly based upon an allocated royalty base.  Further, several of the Publishing Agreements pursuant to which the Defendant contends that it has the right to create "Mastered" versions of Plaintiff's works do not authorize Pearson to transform Plaintiff's copyrighted content into digital and electronic media.  Pearson has underpaid royalties on the Mastering products in the amount of at least $414,052.

37.     Although Pearson contends that Plaintiff did not create any content on the "tutorial" and "video" portions of the "Mastering" products, in fact it has copied Plaintiff's copyrighted work in both the video and tutorials and seeks to avoid paying Plaintiff royalties therefor.

38.     <u>Subsidiary Sales</u>.  Pearson pays royalties on adaptations and translations by Pearson affiliates and subsidiaries pursuant to the Publishing Agreements at 50% of the amount received by Pearson in the United States ("Pearson North America").  Pearson North America "contracts"

with its subsidiaries through individual agreements which are generally consistent in form but vary in detail as to term and royalties rates and the like. Hibbeler receives a greatly reduced per unit royalty payment on sales by subsidiaries. In practice, Pearson North America receives 10% of the net cash received by subsidiaries and then pays Hibbeler 50% of that, making Hibbeler's effective rate 5% of the amount of net cash received reported by the subsidiary. The resulting per unit payment, however, is consistently below even that lowered rate. Hibbeler is not a party to Pearson's agreements with its own subsidiaries.

39. The Publishing Agreements specifically address foreign sales and translations and provide that, generally, the appropriate royalty rate for Foreign Sales is 9% and the rate for Translations is 9-10%. A calculation using these amounts yields an underpayment of at least $661,338, together with interest in the amount of $73,586, for a total underpayment or non-payment in the amount of $734,924 with respect to these foreign sales by Pearson affiliates and sales of Translations. Defendant has breached the Publishing Agreements by paying royalties on sales by its foreign subsidiaries as if they were the proceeds of a license, when, in fact, the structure of those sales is a device to enable Pearson to attempt to avoid paying Plaintiff the appropriate royalty for foreign sales, and should be considered "foreign sales" or "translations", instead of a license with one of its foreign subsidiaries. Pearson, however, in purported reliance on a provision in several of the Publishing Agreements which provides that licenses to an intra-company affiliate "will be treated" as if they were with a third party publisher, pays an effective rate of 5% on these foreign works by purporting to "license" them to an affiliate at an arbitrary, non-arms'-length 10% rate, and, treating it as if it were a license, paying Plaintiff one-half (½) thereof.

40. Moreover, Pearson has failed to pay royalties at 12% on the "International Student Edition" of "Engineering Mechanics: Statics and Dynamics" as agreed.

41. In addition, the RCO Audit revealed that there are numerous inconsistencies in Pearson's books and records of its subsidiary sales, including ISBNs on which royalties are paid inconsistently, if at all; discrepancies in unit sales for the same periods of the same ISBNs on different Pearson reports; and at least 38 ISBNs upon which it appears that no royalties have been paid at all. RCO has determined that Pearson has underpaid an additional $94,909 with interest thereon in the amount of $10,560, thus yielding a total of at least $840,393 in underpayments and non-payments with respect to sales by Pearson subsidiaries, as discussed at ¶¶ 37-40.

42. <u>Alternative Payment of Sales by Subsidiaries at Reduced Rate</u>. As discussed at paragraph 34-36, *supra*, Pearson pays royalties on adaptations and translations by Pearson affiliates and subsidiaries at 50% of the amount received by Pearson in the United States. Should the Court determine that the publishing agreements require Pearson to pay to Plaintiff 50% of the revenue received by Pearson at the source of the sale, that amount would be $7,977,864 in additional royalties, with interest thereon at 4% in the amount of $923,954, for a total additional amount owed of $8,901,823.

43. <u>Additional Sales by Subsidiaries at Reduced Rate</u>. In addition to those sales described in ¶ 37, *supra.*, the RCO Audit has identified additional units which were previously unreported by Pearson which, pursuant to an "at source" calculation on sales by subsidiaries, results in a total claim, inclusive of the previously unreported units of $9,122,167, with interest thereon at $1,056,556, for a total amount of $10,179,323 representing the royalty calculated on the at source payment of all units sold by the foreign affiliates of adaptations and translations during the audit period.

44. <u>Other Product Not Reported/Paid</u>. The RCO Audit also revealed that there are numerous products upon which Pearson has provided no sales data and no royalties have been

reported, although Pearson identifies Hibbeler as the author of those products. While it is necessary to find the precise amount of underpayment for these unreported products, the RCO Audit has disclosed that there is a list of 193 ISBNs which should be reported as Mastering products and that no royalties were paid during the audit period with respect to 106 of these particular ISBNs. In addition, there are 92 ISBNs listed in various reports provided by Pearson in the RCO Audit that are "Kits." RCO has determined that Pearson has failed to pay or underpaid royalties with respect to these items in at least the amount of $323,517.

45. <u>Additional Sales Not Reported</u>. Despite repeated requests for it, Pearson has failed to provide complete information to RCO in the course of the audit with respect to total sales of Kit and Custom products, Study Packs, Mastering products, subsidiary sales, additional amounts due from periods prior to 2009 and other miscellaneous matters. RCO expects to find that there are additional amounts unpaid or underpaid when it is provided with the opportunity to examine these additional materials which Pearson has failed to provide during the audit.

46. <u>Interest at 10%</u>. Throughout RCO's calculation of amounts due, interest has been calculated at 4% simple interest. Should interest, however, be calculated at a 10% rate, the underpayment would total, including 10% interest on the at source claims seeking a 50% royalty rate, the amount of $1,811,345.

## COUNT I
## COPYRIGHT INFRINGEMENT

47. Plaintiff incorporates Paragraphs 1-46 as if fully set forth herein.

48. Pearson has failed to pay Plaintiff for the right to publish, distribute and exploit Plaintiff's works and has, therefore, infringed Plaintiff's copyrights in the works, more specifically, each titled textbook and each edition thereof, and works derived therefrom.

49. In addition, Defendant has, without permission, infringed Plaintiff's copyrights in certain works by publishing and distributing electronic and digital versions of the work.

50. Further, Defendant has infringed Plaintiff's copyrights by creating unauthorized new works.

51. As a result of these infringements, Plaintiff is entitled to its actual damages and, in the alternative, to statutory damages for willful copyright infringement and its attorneys' fees and costs for each infringement.

## COUNT II
## BREACH OF CONTRACT

52. Plaintiff incorporates Paragraphs 1-51 as if fully set forth herein.

53. Defendant has breached the Publishing Agreements by failing to pay royalties and other compensation pursuant to the Publishing Agreements to Plaintiff; by creating unauthorized products and failing to pay appropriate compensation therefor; and by creating unauthorized versions of the various textbooks which Plaintiff has authorized the Defendant to publish and distribute.

54. As a proximate result of Defendant's breaches of contact, Plaintiff is entitled to damages as set forth herein and all additional amounts that may be due as a result of sales which have yet to be reported and accounted for by Pearson.

## COUNT III
## VIOLATION OF THE LANHAM ACT, 15 U.S.C. §1125(a)

55. Plaintiff incorporates Paragraphs 1-54 as if fully set forth herein.

56. Defendant has violated the Lanham Act by representing that Plaintiff is the author of works which include material which he has neither created nor approved, nor authorized Pearson to publish and distribute. Because Plaintiff has no control over the unauthorized material which

has been sold and distributed as if it were his creation, and that material is not of the quality of Plaintiff's work, his reputation may be damaged. Further, in other instances, Defendant has, without Plaintiff's permission, attributed co-authorship to other persons whose reputations are inferior to those of Plaintiff, tending to injure Plaintiff's reputation by associating Plaintiff as a collaborator with those other alleged "co-authors." In addition, Defendant has created works utilizing Plaintiff's materials without attributing the work to Plaintiff, all of which is likely to cause confusion or to deceive as to Plaintiff's affiliation, connection or association with another person or as to the origin, sponsorship or approval of the works published and distributed by Defendant.

57. In many instances, Plaintiff has put Defendant on notice that the quality of the materials, the attributions thereof and the packaging thereof tended to misrepresent Plaintiff's authorship and his association with other alleged "co-authors"; yet Defendant has ignored Plaintiff's concerns.

58. Because Defendant's violations of the Lanham Act have been willful, Plaintiff is entitled, pursuant to 15 U.S.C. § 1117, to recover the Defendant's profits; any damages sustained by Plaintiff; and the costs of the action, together with treble damages.

59. Because Defendant's violations have been egregious, ongoing, numerous and intentional, and Defendant has failed to address Plaintiff's many complaints, this is an "exceptional case" and Plaintiff, therefore, seeks an award of his reasonable attorneys' fees.

## COUNT IV
## DECLARATORY JUDGMENT

60. Plaintiff incorporates Paragraphs 1-59 as if fully set forth herein.

61. Pursuant to the Publishing Agreements, when a work authored by Plaintiff is "out of print", or "declared as out of print" by Defendant, Plaintiff is entitled to a reversion of all rights to that out of print work. While, during the course of the audit and otherwise, Defendant has

16 of 20
Case 3:17-cv-00945   Document 1   Filed 06/15/17   Page 16 of 20 PageID #: 16

declared that several of Plaintiff's works were "out of print," Defendant has refused to cause the rights therein to revert to Plaintiff.

62. In fact, despite the Defendant's repeated representations otherwise, when Plaintiff demanded an accounting of which works had been declared as "out of print" by the Defendant, the Defendant responded that there were no such works and refused to grant reversions to Plaintiff in any such works.

63. Plaintiff, therefore, seeks this Court's declaration as to which works are, or have been declared to be "out of print" and Plaintiff's right to reversion therein.

## COUNT V
## ACCOUNTING

64. Plaintiff incorporates Paragraphs 1-63 as if fully set forth herein.

65. Defendant has a duty to account to Plaintiff for profits obtained, derived, or resulting from the exploitation of Plaintiff's works and royalties paid therefor, including, but not limited to, any other person or entity acting under a license, sublicense, lease and/or transfer of rights under the Publishing Agreements.

66. The duty requires Defendant to disclose to Plaintiff all income collected from such exploitation, and to pay Plaintiff his share of the profits pursuant to the terms set forth in the Publishing Agreements.

67. The precise nature and extent of the monies payable by Defendant to Plaintiff are unknown at the present time, and its profits cannot be determined without a full accounting of their transactions relating to the exploitation of Plaintiff's works, including, but not limited to, all income associated with unreported ISBN's, other products not reported/paid by Defendant, additional unreported Study Packs sold by Defendant, and for all products sold by Defendant and its affiliates, domestic and foreign.

68. Furthermore, upon information and belief, the accounts presented are of such complexity that adequate relief cannot be obtained at law, and an accounting of Defendant's accounts is necessary to effectuate justice between the parties, and establish the amounts owed to Plaintiff by Defendant.

69. Plaintiff, therefore, seeks an order from the Court directing Defendants to render a full and complete accounting to Plaintiff of the amounts received as well as a judgment against the Defendant for a sum to be determined in the accounting, with pre-judgment and post-judgment interest, as allowed by law.

## COUNT VI
## UNJUST ENRICHMENT

70. Plaintiff incorporates Paragraphs 1-69 as if fully set forth herein.

71. As set forth, *supra*, Plaintiff has conferred a benefit upon Defendant by virtue of creating works for publication and distribution. Defendant was fully aware of these benefits, has clearly benefited from them, and continues to benefit from them, all to Plaintiff's detriment.

72. Defendant has accepted and retained these benefits under circumstances that it would make it unfair and unjust for Defendant to continue to retain them without fair and just payment of their value to Plaintiff.

73. Under the circumstances described herein, it would be inequitable for Defendant to retain such ill-gotten benefits without paying Plaintiff for the value of those benefits.

74. As a result of Defendant's failure to account to Plaintiff for profits arising from the exploitation of certain works, Defendant has received, directly or indirectly, funds to which it is not entitled, in amounts to be determined at trial, and has been unjustly enriched thereby.

75. Plaintiff is entitled to and requests a judgment against Defendant for Plaintiff's damages, together with pre-judgment and post-judgment interest, costs, imposition of a constructive trust, and other just and proper relief.

**WHEREFORE**, Plaintiff demands judgment as follows:

1. For compensatory damages as a result of Defendant's breaches of the Publishing Agreements; and

2. For infringement of his copyrights, recovery of Plaintiff's actual damages and/or, in the alternative, for an award of statutory damages for willful infringement for each infringement at the maximum statutory amounts; and

3. For violation of the Lanham Act, 15 U.S.C. § 1125(a), Defendant's profits, Plaintiff's actual damages, and treble damages; and

4. For an award of Plaintiff's attorneys' fees and costs; and

5. For a complete accounting by Defendant of all sales of works published which embodies content authored by Plaintiff, in whole or in part; and/or for which Plaintiff is attributed as an author or co-author by Defendant and all revenues received by Defendant from the exploitation thereof.

6. For a declaration as to those works which are or should be declared to be "out of print" and a determination as to Plaintiff's revisionary rights therein; and

7. For damages resulting from Defendant's unjust enrichment;

8. For such other and further general relief as to which Plaintiff may be entitled.

June 15, 2017					Respectfully submitted,


					/s/ Jay S. Bowen_____
					**Jay S. Bowen, TN BPR No. 2649**
					**John P. Nefflen, TN BPR No. 020226**
					**Lauren Kilgore, TN BPR No. 030219**
					**Rebekah Shulman, TN BPR No. 027537**
					SHACKELFORD BOWEN MCKINLEY & NORTON, LLP
					47 Music Square East
					Nashville, TN 37203
					Tel: (615) 329-4440
					Fax: (615) 329-4485
					jbowen@shackelfordlaw.net
					jnefflen@shackelfordlaw.net
					lkilgore@shackelfordlaw.net
					rshulman@shackelfordlaw.net

					*Attorneys for Plaintiff Russell C. Hibbeler*